MARK J. YOUNG
  Fla. Bar No. 0078158
Pro Hac Vice
  myoungpa@gmail.com
MARK YOUNG, P.A.
1638 Camden Avenue
Jacksonville, FL  32207
Tel.:  904-996-8099
Fax:  904-980-9234

Attorney for Oceanic Production
Equipment, Ltd. and Jordan Klein Sr.

David A. Peck
SBN 171854
Coast Law Group LLP
1140 South Coast Highway 101
Encinitas, California 92024
Tel.  760.942.8505 x108
Fax 760.942.8515
Email dpeck@coastlawgroup.com

Attorneys for Oceanic Production
Equipment, Ltd. and Jordan Klein Sr.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VOICE INTERNATIONAL, INC., a California corporation; DAVID GROBER, an individual,<br><br>       Plaintiffs,<br><br>  vs.<br><br>OPPENHEIMER CINE RENTAL, LLC, a Washington corporation; OPPENHEIMER CAMERA PRODUCTS, INC., a Washington corporation; MARTY OPPENHEIMER, an individual; JORDAN KLEIN, SR., an individual; JORDAN KLEIN, JR., an individual; JOHN DANN, an individual; Mako Products, an unknown entity, Oceanic Production Equipment, Ltd., a Bahamian company; and DOES 1-10, inclusive,<br><br>       Defendants. | Case No. 2:15-cv-08830-JAK-KS<br><br>*The Honorable John A. Kronstadt, Courtroom 10B*<br><br>**DEFENDANT JORDAN KLEIN SR.'S EX PARTE APPLICATION TO STAY OR CONTINUE THE TRIAL PENDING REEXAMINATION, OR, IN THE ALTERNATIVE, FOR LEAVE TO MOVE FOR SUMMARY JUDGMENT AND TO CONTINUE THE TRIAL PENDING A RULING ON THE MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Filed:   November 12, 2015 |

1

**EX PARTE APPLICATION TO STAY**

PLEASE TAKE NOTICE that Defendant Jordan Klein Sr. hereby files this Application to stay or continue the trial pending reexamination or, in the alternative, to grant leave to file the motion for summary judgment (MSJ) attached as Exhibit 1.  This Application is and will be based on this Notice of Application and the accompanying Memorandum of Points and Authorities in support thereof.

As summarized in the Memorandum and detailed in Exhibit 1, new prior art clearly anticipates every asserted claim of the '662 patent.  The new prior art teaches all elements of each asserted claim, especially those elements that were not taught in the old prior art relied upon in original examination and the prior reexamination.  Every element of every asserted claim of the '662 patent is disclosed in the prior art.

A stay pending the reexamination will likely avoid a trial and the risk of an inconsistent adjudication.  As the accused MakoHeads are not in use and will remain so during the pendency of this case, a stay would not prejudice Plaintiffs.

Alternatively, leave to file a Motion for Summary Judgment that the asserted claims of the '662 patent are invalid under 35 U.S.C. §102 will lead to a swift and efficient termination of this case and will avoid unnecessary waste of the Court's, the parties' and jurors' time and resources.

This Application is made following a conference of counsel pursuant to Local Rule 7-3 on September 24-25, 2019.  Plaintiffs have not approved this Application.

Dated:  September 26, 2019            Respectfully submitted,

**EX PARTE APPLICATION TO STAY**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MARK YOUNG, P.A.

By:  *s/Mark J. Young*
MARK J. YOUNG

Attorney for Defendants Oceanic
Production Equipment, Ltd. and Jordan
Klein Sr.


COASTAL LAW GROUP LLP

By:  *s/David A. Peck*
David A. Peck
Attorneys for Defendants Oceanic
Production Equipment, Ltd. and Jordan
Klein Sr.

**EX PARTE APPLICATION TO STAY**

# TABLE OF CONTENTS OF

## MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION ................................................................................6

II. A STAY IS WARRANTED ...............................................................9

III. PROSECUTION HISTORY ............................................................12

   A. Summary ..................................................................................12

   B. Original Prosecution of US Patent No. 6,611,662 ..................12

   C. First Reexamination of US Patent No. 6,611,662 ..................14

IV. NEW PRIOR ART ...........................................................................15

   A. Overview ..................................................................................15

   B. NASA's Instrument Pointing System ......................................17

   C. Tijsma .......................................................................................21

   D. Bos ...........................................................................................22

   E. Vaassen ....................................................................................24

   F. Significance of The New Prior Art ..........................................26

V. SUMMARY JUDGMENT ................................................................26

VI. CONCLUSION .................................................................................27

EXHIBITS

   Exhibit 1 -- Proposed Motion for Summary Judgment with Exhibits

   Exhibit 2 – Proposed Order Granting Stay

   Exhibit 3 – Proposed Order Granting Leave to Move for Summary Judgment

## EX PARTE APPLICATION TO STAY

## TABLE OF AUTHORITIES

**Cases**

*eSoft, Inc. v. Blue Coat Sys.*, 505 F. Supp. 2d 784, 788 (D. Colo. 2007)..........11, 12

*Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*, No. SACV 12-21-JST (JPRx), 2012 WL 7170593, at *4 (C.D. Cal. Dec. 19, 2012)....................................9

**Statutes**

*35 USC 102* ................................................................. 17, 21, 22, 24, 26, 28

*35 USC 305* ...........................................................................................11

**EX PARTE APPLICATION TO STAY**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

On June 15, 2016, about 7 months after initiating this lawsuit, Plaintiffs filed a First Amended Complaint (FAC) [Dkt. 36].  The FAC named, as additional parties, Jordan Klein Sr., Jordan Klein Jr., John Dann and Oceanic Production Equipment Ltd (OPEL).  Original claim construction briefing and argument proceeded, without any participation from OPEL or Klein Sr.  OPEL and Klein Sr. refrained from participation while their motions to dismiss [Dkt. 55 – July 18, 2016] for lack of personal jurisdiction were pending and undecided.  The Court ruled on the motions in a jurisdictional order [Dkt. 142] on May 27, 2017, dismissing Klein Sr., Klein Jr. and John Dann for lack of personal jurisdiction.

On June 4, 2017, Defendant OPEL moved to dismiss [Dkt. 144] the FAC for failure to state a claim upon which relief can be granted.  The FAC was exceedingly vague.  Fatal deficiencies included a failure to even identify the claims of the Patent that the Defendants allegedly infringed.  The Court granted OPEL's motion to dismiss [Dkt. 216] on January 18, 2018.

After dismissal of the FAC, Plaintiffs filed a Second Amended Complaint (SAC) [Dkt. 220 -- Feb. 1, 2018].  In the SAC, Plaintiffs alleged infringement of only eight claims of the Patent, namely, claims 1, 3, 4, 14, 31, 32, 35 and 38 of the Patent.

Original claim construction briefing and a hearing concluded before the Court's jurisdictional ruling [Dkt. 142] on May 27, 2017.  In the order [Dkt. 216] granting OPEL's 12(b)(6) motion to dismiss dated January 18, 2018, the Court directed supplemental claim construction for two specific claim limitations.  Supplemental claim construction concluded with the Court's order [Dkt. 252] on June 20, 2018.

**EX PARTE APPLICATION TO STAY**

On March 22, 2019, the Court granted summary judgment of noninfringement against Claim 31 [Dkt. 293].  Thus, after the summary judgment order, only seven claims, namely claims 1, 3, 4, 14, 32, 35 and 38 remain at issue.

On  May 22, 2018, Plaintiffs moved for relief from the Court's jurisdictional order [Dkt. 142], which the Court subsequently denied as to Klein Jr. and Dann, but granted as to Klein Sr. [Dkt. 294] on March 25, 2019. Plaintiffs argued for personal jurisdiction over Klein Sr. on the theory that OPEL is an alter ego of Klein Sr.  In the order granting the motion for relief, the Court ordered Plaintiffs to file a Third Amended Complaint (TAC) as to Klein Sr.  [Dkt. 294-pg. 13].

On April 4, 2019, Plaintiffs filed a Third Amended Complaint (TAC) [Dkt. 296] against Klein Sr.  The TAC, without leave, contained two new causes of action, added 17 claims of the '662 Patent to the allegations of infringement, alleged that OPEL and Klein Sr. are successors to Mako Products, and contained new requests for relief, all of which were improper. On April 18, 2019, Defendant Klein Sr. moved to dismiss/strike [Dkt. 303] the TAC.  The court granted Defendants' motion on May 13, 2019. [Dkt. 311]. Plaintiffs file a Fourth Amended Complaint (FAC) [Dkt. 313] on May 20, 2019, which Klein Sr. anwered on June 3, 2019.

In an April 18, 2019 Order on a Joint Status Report [Dkt. 304, page 1 of 2], this Court denied Klein Sr. an opportunity to file any dispositive motion. The Court stated: "Klein Sr. has been added as a party solely on the basis that the aforementioned prima facie showing has been made as to whether he is an alter ego of OPEL. Given that the premise of this assertion is that Klein Sr. and OPEL should be deemed one and the same, and that Klein Sr. disputes this

**EX PARTE APPLICATION TO STAY**

claim, there is no basis to allow him to raise a new claim construction dispute and additional motions."

After answering the FAC on June 3, 2019, Klein Sr. requested that counsel Mark Young determine if any prior art clearly and convincingly renders the asserted claims of the '662 patent invalid.  Prior to Klein Sr.'s request, Defendant Oceanic Production Equipment Ltd. lacked the financial resources to support such an undertaking.  The effort entailed a review of 1,881 pages of prior art patents and technical non-patent publications, all of which had been produced during discovery.  Mr. Young completed the effort by the end of June 2019.

After careful and thorough analysis, Mr. Young determined that several prior art references clearly anticipate every asserted claim of the '662 patent. With the option of a dispositive motion foreclosed by this Court's April 18, 2019 Order [Dkt. 304, page 1 of 2], Mr. Young recommended an ex parte reexamination.

On July 23, 2019, Klein Sr. filed a Request for Ex Parte Reexamination No. 90014342, which challenged the validity of every asserted claim of the '662 patent, i.e., claims 1, 3, 4, 14, 32, 35 and 38.  On September 10, 2019, the US Patent and Trademark Office granted the Request for Reexamination against every asserted claim.  Busy with pre-trial filings and deadlines after September 10, 2019, Mark Young did not have a chance to prepare this Ex Parte Application until September 25, 2019.

On August 16, 2019, counsel for the parties met as required under LR 16-2.  As required by LR 16-2.9, Mark Young, counsel for Defendants OPEL and Klein Sr. broached settlement.  In addressing settlement, Mr. Young referred to prior art that was delivered during discoveryand forms the basis for the Ex Parte Reexamination Proceeding that is currently pending at the USPTO.  Mr. Young

**EX PARTE APPLICATION TO STAY**

asked Messrs. Grober and Lauson if they had considered the prior art. While Mr. Grober claimed that he had reviewed the prior art and determined that it did not anticipate the asserted claims, he could not identify a single claim element that is not described in the prior art. Mr. Lauson, counsel for Voice International, vacillated, first saying that he had not reviewed the prior art, then saying that he "looked at it" but was not prepared to discuss it. Despite Plaintiffs' failure to identify a single claim element that is not described in the prior art, Plaintiffs continue with this lawsuit.

During a conference of counsel pursuant to Local Rule 7-3 on September 9, 2019, Plaintiffs expressed their intent to move to exclude all evidence pertaining to the pending reexamination on the ground of irrelevance, because it is merely a pending petition. Mark Young asserted to Robert Lauson that the reexamination would be relevant if the USPTO found a substantial new question of patentability. Mr. Lauson agreed, but observed that such a finding had not been made as of September 9, 2019. The following day the USPTO granted the request for reexamination, finding a substantial new question of patentability.

## II.  A STAY IS WARRANTED

This District promotes a liberal policy in favor of staying patent litigation while parallel invalidity proceedings are ongoing in the PTO. *Semiconductor Energy Lab. Co. v. Chimei Innolux Corp.*, No. SACV 12-21-JST (JPRx), 2012 WL 7170593, at *4 (C.D. Cal. Dec. 19, 2012) (granting motion for stay "in light of the liberal policy in favor of granting motions to stay proceedings pending the outcome of USPTO proceedings"). A stay in this case is appropriate under the four factors this Court considers when staying litigation pending PTO invalidity proceedings: (1) simplification of issues for trial; (2) stage of the litigation; (3) undue prejudice or clear tactical disadvantage to the

**EX PARTE APPLICATION TO STAY**

nonmoving party; and (4) reducing the burden of litigation on the parties and on the Court.

First, a stay will simplify the issues for trial.  Indeed, the PTO may likely invalidate all of Plaintiffs' asserted patent claims, which would remove them from this action entirely.  Even if any of the claims survive, waiting for the outcome of the Reexamination would facilitate trial by providing the Court and the parties with the expert opinion of the PTO and by clarifying the scope of the claims.  In view of the breadth of the asserted claims and the teachings of the prior art, here it is unlikely that any of the asserted claims will survive Reexamination.  Indeed, Plaintiffs' inability to engage in settlement discussions by identifying any element of the asserted claims that is not taught in the prior art speaks volumes.  Additionally, regardless of the outcome of the Reexamination, a final written decision on the merits will narrow the issues for trial in the unlikely event that any asserted claims survive.

Second, a stay will prevent any unnecessary expenditure of resources by the Court and the parties. While this case has progressed to the pre-trial stage, costly and time-consuming stages of the case have yet to occur.  The Reexamination is likely to spare the Court, the jurors and the parties considerable time and expense.  And as discussed below, the Reexamination is likely to invalidate every asserted claim as plainly evident in view of the prosecution history, breadth of the claims and teachings of the prior art.

That discovery is complete and a trial date set does not compel denying a stay.  Not until the Court issued its order [Dkt. 294] on March 25, 2019, did it even become clear that Klein Sr. would be a party to this action.  Further, as a result of Plaintiffs' gamesmanship with the Third Amended Complaint, it was not until June 3, 2019 that Klein Sr. even answered a complaint in this action and knew what claims were asserted.  Earlier in this case, Klein Sr. did not have

**EX PARTE APPLICATION TO STAY**

reason to challenge the validity of the '662 patent, as he was not a party. Concomitantly, OPEL had very limited resources, not enough to carefully analyze the prior art, identify the references that clearly and convincingly anticipate each asserted claim, and develop the argument in support of such a finding.

Many courts have stayed cases that were pending longer, and did so shortly before trial. *eSoft, Inc. v. Blue Coat Sys.*, 505 F. Supp. 2d 784, 788 (D. Colo. 2007) (collecting authorities[1]). Until recent months, Klein was unable to predict that he would be a party and have a strong interest in invalidating the asserted claims. Even after realizing he would be a party, he was not able to predict the claims at issue until the Court struck Plaintiffs' Third Amended Complaint. Only after the Court's May 13, 2019 order [Dkt. 311], was it even clear to Klein Sr. what claims are asserted. While the stage of this action may not favor granting a stay, it does not present sufficient grounds to deny it.

---

[1]"See, e.g., *Gould* [v. Control Laser Corp., 705 F.2d 1340, 1342 (Fed. Cir.), *cert. denied*, 464 U.S. 935, 104 S. Ct. 343, 78 L. Ed. 2d 310 (1983).], 705 F.2d at 1342 (granting motion to stay proceedings five years into litigation and twenty days before scheduled trial date); *Middleton, Inc. v. Minn. Mining & Mfg. Co.*, 2004 U.S. Dist. LEXIS 16812, at *35 (S.D. Iowa 2004) (granting motion to stay proceedings eight years after start of litigation and less than two months before trial); *Loffland Bros. Co. v. Mid-Western Energy Corp.*, 225 U.S.P.Q. 886, 887 (W.D. Okla. 1985) (granting motion to stay proceedings after significant discovery, rulings on dispositive motions, pretrial conference and setting of initial trial date); see also *Motson v. Franklin Covey Co.*, 2005 U.S. Dist. LEXIS 34067, 2005 WL 3465664, at *2 (D. N.J. 2005) (granting stay despite discovery being complete and summary judgment decided); *Softview* [*Computer Prods. Corp. v. Haworth, Inc.*], 56 U.S.P.Q.2d [1633] at 1636 [(S.D.N.Y. 2000)](granting stay after summary judgment motions were served); Robert H. Harris Co., 19 U.S.P.Q.2d at 1789 (granting stay one month prior to trial date)"

**EX PARTE APPLICATION TO STAY**

Third, a stay will not prejudice Plaintiffs. The Reexamination must be completed quickly under the governing statute. 35 U.S.C. 305 requires that ex parte reexamination proceedings "will be conducted with special dispatch." 37 CFR 1.550(a).  Moreover, Plaintiffs have no compelling need to proceed to trial before the PTO conducts its review.  The accused MakoHeads are not in use, and there is no risk that they will be placed in use while this lawsuit is pending. As a result of this lawsuit, Defendant OPEL ceased business operations. According to Plaintiffs, Plaintiff Voice International has also ceased business. [Dkt. 332, p. 4 of 19, lines 14-15].  Additionally, the '662 patent will expire by May 26, 2020, which is only eight months away. There is also no clear tactical advantage to Defendants with a stay.

Fourth, a stay would reduce the burden of litigation on the Court, jurors and the parties. The instituted Reexamination is likely to eliminate Plaintiffs' entire patent case and, in the event any claims survive, the issues for trial will be greatly simplified and focused.  Further, a stay would ensure that the parties and the Court have the benefit of a complete analysis of the asserted claims *vis-à-vis* the prior art.

In sum, a stay, even at this late juncture, is in the best interest of judicial and party efficiency.  Therefore, Defendant Klein Sr. respectfully requests that the Court grant this Motion.

## III. PROSECUTION HISTORY

### A.    Summary

The prior art cited in the reexamination includes three publications, two patents and an international PCT publication, each of which anticipates asserted claims of the '662 patent and together anticipate every asserted claim of the '662 patent.  The prior art was carefully selected to clearly and convincingly

**EX PARTE APPLICATION TO STAY**

address deficiencies of the prior art cited during original prosecution and first reexamination.

**B.      Original Prosecution of US Patent No. 6,611,662**

The '662 patent issued on August 26, 2003, from U.S. Application No. 09/579,723 filed on 26 May 2000.  The original examiner issued a Final Office action on October 30, 2002 rejecting claim 21 (*i.e.*, now patent claim 1) over *Buell* (U.S. Patent No. 4,070,674).  Plaintiff David Grober filed a response on February 28, 2003 amending claim 21 to include the limitations of claim 4 (*i.e.*, *wherein the second sensor package is fixed to the payload platform*) and placing the examiner deemed allowable subject matter of claims 12, 24 and 26 into new independent claims 46, 50 and 49 (*i.e.*, now patent claims 32, 38 and 35), respectively. The original examiner issued a Notice of Allowance on April 2, 2003 providing as "reasons for allowance":

> The prior art does not teach a stabilized platform for a camera comprising, in combination with the additionally recited features, a first sensor package, fixed to the base, for determining, in two transverse directions, motion of a moving object on which the stabilized platform is mounted, ***a second sensor package*** comprising sensor means for ***sensing a position of the payload platform and for providing information based on the position of the platform relative to a predetermined position***, or the ***levels sensors for the stabilized platform and measuring and self correcting*** for anomalies based on info from a second sensor (i.e. stabilization in response to first sensor causes drift and second set of sensors are used to correct the drift), or ***information used from second sensor at a different rate than the first sensors***.

(Exhibit 4 to MSJ – April 2003 Notice of Allowance at 2; emphasis added).

**EX PARTE APPLICATION TO STAY**

From the record, the key features missing from the prior art at the time of allowance of claims of the '662 patent were:

Claims 1, 4 and 35 – *the second sensor package is **fixed to/mounted on** the payload platform*;

Claims 3 and 31 – *the second sensor package **including a level sensor***;

Claim 14 – ***self correcting** the position of the payload platform to the predetermined position based on information collected by the second sensor package*;

Claim 32 – *wherein the control system allows a user to set an initial payload platform position and provides **self correction** of the platform to the initial position*;

Claim 35 – *wherein the first sensor package comprises sensors for sensing a **different type of information** from the sensor means in the second sensor package*; and

Claim 38 – *wherein the control system **responds to information from the first sensor package more often than the control system responds to information from the second sensor package***.

### C.   First Reexamination of US Patent No. 6,611,662

On May 5, 2005, an *inter partes* reexamination request was filed, as reexamination Control No. 95/000,092, for claims 1-38 of the '662 patent. On June 29, 2005, the USPTO mailed an Order granting the *inter partes* reexamination for claims 1-38 of the '662 patent .  In addition, the examiner provided a Non-Final Office Action rejecting claims 1, 4 and 35 as anticipated by *Welch* (U.S. Patent No. 5,922,039) (Exhibit 5 to MSJ - Ground #1), claim 32 over *Welch* and *Algrain* (U.S. Patent No. 5,124,938) (Exhibit 5 to MSJ -Ground # 10), claims 1, 14 and 35 as anticipated by *Duckworth* (U.S. Patent No. 4,143,312) (Exhibit 5 -Ground #11),

**EX PARTE APPLICATION TO STAY**

claim 4 over *Duckworth* and *Welch* (Exhibit 5 to MSJ -Ground # 12), claim 32 over *Duckworth* and *Algrain* (Exhibit 5 to MSJ -Ground # 21), and indicating the patentability of claims 3, 21, 31 and 38 (Exhibit 5 to MSJ - at 21-22).

In a response filed by Plaintiff David Grober on October 31, 2005, Plaintiff provided an amendment to claim 14 with the second sensor now being required to be "***fixed wholly to the payload platform***" and an argument that the claims 1, 4, 32 and 35 were patentable because the stabilized platform of *Duckworth* and *Welch* did not have a second sensor package that is ***fixed to/mounted on*** the payload platform. (Exhibit 6 to MSJ). In the Notice of Intent to Issue a Reexamination Certificate provided by the examiner on September 30, 2010, the examiner confirmed claims 1-37, stating:

> the prior art of record fails to teach or make obvious a stabilized platform having ***a second sensor package that is fixed to the payload platform***

(emphasis added).

In addition, the examiner confirmed claim 38, stating:

> the prior art of record fails to teach or make obvious a stabilized platform having a control system wherein ***the control system responds to information from the first sensor package more often than to information from the second sensor package***

(emphasis added).

Thus, from the record, the key features missing from the prior art at the time of confirmation of patentability for the asserted claims of the '662 patent was "*a second sensor package that is fixed to the payload platform*"; and "*the control system respond[ing] to information from the first sensor package more often than to information from the second sensor package.*"

## IV.   NEW PRIOR ART

**EX PARTE APPLICATION TO STAY**

A.    **Overview**

On July 23, 2019, Klein Sr. filed a Request for Ex Parte Reexamination, Control No. 90/014,342 ("'342 Proceeding"), which challenged the validity of every asserted claim of the '662 patent based upon new prior art.  A total of six prior art references were asserted in the request for reexamination.  Each prior art reference is new, i.e., has not previously been considered by the USPTO or a court.  Each prior art reference was carefully selected to anticipate by teaching all elements of the asserted claims, especially the elements that the previously considered prior art failed to teach.  On September 10, 2019, the US Patent and Trademark Office granted the Request for Reexamination against every asserted claim, based upon the prior art referenced above.  The references include three non-patent publications, two patents and one International Publication under the Patent Cooperation Treaty, as follows:

- *West, M.E.*, "*Real time Recursive Filter for Attitude Determination of the Spacelab Instrument Pointing Subsystem*," NASA Technical Memorandum 10353, p.206, National Aeronautics and Space Administration, George C. Marshall Space Flight Center, 1992 ("*West*") [Exhibit 7 to MSJ]

- *Wessling et al.*, "*ASTRO-2 Spacelab Instrument Pointing System Mission Performance*," AIA 1995 Space Programs and Technologies Conference, p.12, National Aeronautics and Space Administration, 26-28 September 1995 ("*Wessling*") [Exhibit 8 to MSJ]

- *Hartmann et al.*, "*The Instrument Pointing System – Precision Attitude Control in Space*," Space Vehicle Flight Mechanics, AGARD Conference Proceedings No. 489, p.17, France, June 1990 ("*Hartmann*") [Exhibit 9 to MSJ]

- U.S. Patent No. 3,986,092 to *Tijsma et al.* ("*Tijsma* ") [Exhibit 10 to MSJ]

- U.S. Patent No. 3,936,716 to *Bos* ("*Bos* ") [Exhibit 11 to MSJ]

16

**EX PARTE APPLICATION TO STAY**

- International Publication No. WO 99/04224 to *Vaassen et al.* ("*Vaassen*") [Exhibit 12 to MSJ]

### B.     NASA's Instrument Pointing System

West [Exhibit 7 to MSJ], Wessling [Exhibit 8 to MSJ] and Hartmann [Exhibit 9 to MSJ] describe NASA's instrument pointing system (IPS) used on Space Shuttle missions.  The IPS was developed by Dornier System under contract to the European Space Agency and was delivered to NASA in 1984.  [West, Introduction, p. 1, para. 1].  In July and August of 1985, the IPS was flown aboard the shuttle to observe solar phenomena as part of the Spacelab-2 mission.  [West, Introduction, p. 1, para. 1; Wessling, Abstract, p. 1, para. 1; Hartmann, Abstract, p. 17-1, para. 1][2]

The IPS, as described by West, Wessling and Hartmann, includes every element of claims 1, 3, 4, 14, 31, 32, 35 and 38. West anticipates claims 1, 3, 4, 14, 31, 32, 35 and 38 of the '662 patent under 35 U.S.C. 102, because West teaches every element recited in the claims. Features taught in West are also taught in Wessling and Hartmann.

The IPS is a three axis stabilized platform that was developed to point observation instruments with stability and accuracy. Page 3 of West includes an exploded view of the IPS with reference numerals for identified components.

The primary hardware component is a three-axis gimbal structure assembly (GSA) (i.e., "*a stabilizing system connected between the payload platform and the base, the stabilizing system including means for moving the payload platform with respect to the base about two different axes for providing the payload platform with stabilization in two dimensions*" as in claim 1 of the '662 patent).

---

[2]. Where an anticipatory reference is a product sold or used in public prior to the critical date for the invention, the product itself, as well as other references discussing the features of that product, may be relied on to show anticipation. *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1060 (Fed.Cir. 1989).

17

**EX PARTE APPLICATION TO STAY**

The GSA contains three identical motors 11, 12, 15 referred to as torque drive units (DU's), one DU for each rotational degrees-of-freedom (DOF). Each DU contains two redundant frameless, brushless, direct current (dc) torque motors. The DUs are commanded by a control system to maintain stability.  [West, Hardware Description, P. 4, ¶ 1]

Mounted on the IPS lower support framework 10 is an accelerometer package (ACP) 8 consisting of three analog force pendulums in an orthogonal configuration ("*a first sensor package for determining, in two transverse directions, motion of a moving object on which the stabilized platform is mounted*," and "*and the first sensor package is fixed with respect to the base*" as in claim 1 of the '662 patent). The ACP 8 outputs are filtered by a high-pass analog filter to remove alternating current (ac) coupling, and a low-pass filter to reduce aliasing due to sampling. The output of the low-pass filter is sampled and held at a 50-Hz frequency before being acquired by the control unit. [West, Hardware Description, P. 4, ¶ 2]

The pallet 2 and the IPS gimbal support structure, including the base plate 4 ("*a base*," as in claim 1 of the '662 patent), pedestal 6, and lower support framework 10 are rigidly attached to the space shuttle payload bay. [West, IPS Simulation Model, P. 34, ¶ 1] The base plate 4 attaches the IPS to the pallet 2 within the Space Shuttle payload bay. Attached to the base plate 4 is the pedestal 6 and support framework 10 that provides a rigid base for the IPS. [Wessling, p. 3, col. 1, Gimbal Structure Assembly, sentences 3-4].

The equipment platform 22 (i.e., "*a payload platform for supporting an article to be stabilized*" as in claim 1 of the '662 patent) is used to mount different hardware components including the gyro unit 18. The instrument payload, mounted on the payload support structure 25, attaches to the equipment platform

**EX PARTE APPLICATION TO STAY**

22 via the payload attachment ring 23 and payload attachment flanges 26. [Wessling, p. 3, col. 1, Gimbal Structure Assembly, sentences 6-7].

A three-axis strap-down inertial reference unit, gyro package (GP)[3] 18, is mounted on the underside of the equipment platform 22 (i.e., "***wherein the second sensor package is fixed to the payload platform***," as in claim 1 of the '662 patent). The GP 18 uses four single-DOF pulse-balanced rate integrating gyroscopes in the rate mode. The four gyro wheels are arranged so that three are orthogonal while the fourth is skewed to provide redundancy in each axis if a single wheel were to fail. The GP 18 outputs a 16-bit data word for each axis at 100 Hz. The delta angle output by the GP 18 is read by the digital controller every 10 ms and is the primary inertial reference. [West, Hardware Description, P. 4, ¶ 3]

A final inertial measurement unit is the Optical Sensor Package (OSP)[2] 24, which consists of three fixed head star trackers (FHST's). Each FHST uses a photomultiplier tube which calculates a star's inertial coordinates from the deflection currents required to direct the incoming photons. A boresight FHST is aligned along the IPS platform line of sight while the other two FHST's are skewed an angle of ±α from the boresight tracker. The angle α is dependent upon whether the IPS mission is to be solar (α = 45°) or stellar (α = 12°). Each FHST is capable of outputting y and z focal plane coordinates for one or two stars. The FHST measurements are averaged 18 times over a 1 second interval before being sent to the control unit to be processed by the ADF. The two skew trackers provide the observability for the IPS roll attitude and roll drifts. [West, Hardware Description, P. 4,3; P. 6, 1]. The OSP 24 is mounted onto the payload to provide unimpeded

---

3   The IPS includes two sensor packages fixed to the equipment (payload) platform, i.e., the GP and the OSP.  Each of these sensor packages is "*a second sensor package comprising sensor means for sensing a position of the payload platform and for providing information based on the position of the payload platform relative to a predetermined position*" as in claim 1 of the '662 patent.

19

**EX PARTE APPLICATION TO STAY**

viewing and to reduce misalignments. [Hartmann, p. 17-2, §1.2, Electrical Configuration, ¶ 3, 2nd sentence; Wessling, p. 2, top left drawing and top right photo showing OSP mounted on payload]. The payload is mounted on the payload support structure 25, which attaches to the equipment platform 22 via the payload attachment ring 23 and payload attachment flanges 26. Thus, the OSP 24 is fixed to the payload support structure 25, which is fixed to the equipment platform 22 (i.e., "*wherein the second sensor package is fixed to the payload platform*," as in claim 1 of the '662 patent).

The IPS uses a multirate, multivariable digital control system (i.e., "*a control system connected to the means for moving for stabilizing the platform in response to information provided by the first sensor package and the second sensor package*," as in claim 1 of the '662 patent) composed of two timing loops-- a fast loop for and a slow loop . The fast control loop, obtains gyro unit 18, resolver, and accelerometer 8 data at 25-Hz to 100-Hz to correct position. [ West, Introduction, P. 1, ¶ 2; Wessling, P. 3, Col. 2, Data Electronics Assembly; Hartmann, p. 17-3, § 2, Control System, ¶ 3, 4th sent. and § 2.1, Attitude Determination, ¶ 1, 2nd sent.]. The fast loop, utilizes gyro measurements, from the gyro unit 18, in a proportional-integral-derivative (PID) feedback, to achieve coarse pointing. An accelerometer feed forward loop is also used in the fast loop to suppress disturbances. [West, Introduction, P. 1, ¶ 2]. See Figure 2 of Wessling-- IPS Control System Diagram.

The slow control loop obtains data through a subsystem computer from the optical sensor package at a sampling rate (e.g., 1-Hz to 25 Hz) less than that of the fast loop, to correct for drifts within the system. The slow loop includes an attitude determination filter (ADF) which is operational during fine pointing. The ADF processes inertial measurements generated by an optical sensor package (OSP) 24 to compensate for inherent gyro drifts, biases, and the resulting attitude errors

20

**EX PARTE APPLICATION TO STAY**

accumulated. Three star trackers of the OSP 24 provide the OSP's inertial measurement outputs from the position of an identified star in each tracker's field-of-view (FOV). [West, Introduction, P. 1, ¶ 3; Wessling, P. 3, Col. 2, Data Electronics Assembly, lines 13-15].

As discussed above, and as shown in the claim charts attached as Exhibit 13 to MSJ, West anticipates claims 1, 3, 4, 14, 31, 32, 35 and 38 of the '662 patent under 35 U.S.C. 102, because West teaches every element recited in the claims.

**C.    *Tijsma***

Tijsma [Exhibit 10 to MSJ] describes a two orthogonal axes (axes 1, 2) stabilizing system that includes an outer gimbal ring 5, an inner gimbal ring 4, a platform 3 [Col. 2, lines 41-45], and, for each axis, a motor 13, gear transmission 16, and tachometer 14 [Col. 3, lines 3-8] ("***a stabilizing system connected between the payload platform and the base, the stabilizing system including means for moving the payload platform with respect to the base about two different axes for providing the payload platform with stabilization in two dimensions,***" as in claim 1 of the '662 patent). The axes 1, 2 are perpendicular. [Col. 1, line 7]. The outer ring 5 ("***a base***" as in claim 1 of the '662 patent) is fastened rigidly to the frame or structure of a ship or other vehicle and, thus, is constrained to move with the ship or vehicle. The inner ring 4 is configured for tilting about axis 1, relative to the outer ring 5. [Fig. 1, Ref. 1, 4, 5].  The platform is configured for tilting about axis 2, relative to the inner ring 4 [Col. 1, lines 29-31; Col. 2, lines 64-67].  One sensor set 28, 29 is fixed to the outer ring 5 [Col. 3, lines 57-62] ("***a first sensor package for determining, in two transverse directions, motion of a moving object on which the stabilized platform is mounted,***" and "***and the first sensor package is fixed with respect to the base,***" as in claim 1 of the '662 patent), and another sensor set 10, 11 fixed to the platform 3 [Col. 2, lines 46-48, lines 59-62] ("***a second sensor package comprising sensor means for sensing a position of the***

**EX PARTE APPLICATION TO STAY**

*payload platform and for providing information based on the position of the payload platform relative to a predetermined position*," and "*wherein the second sensor package is fixed to the payload platform*," as in claim 1 of the '662 patent). The outer ring sensors 28, 29 are angular velocity indicators [Col. 3, lines 54-61], such as rate gyros or angular accelerometers. [Col. 1, lines 49-50; Col. 2, lines 28-30]. The other set is a platform mounted vertical gyro package 7 [Col. 2, lines 46-48] that includes a pair of synchros 10, 11 (i.e., position sensors). Synchro 11 produces error voltages for axis 1. [Col. 2, line 67- Col. 3, line 8]. Synchro 10 produces error voltages for axis 2. The control system includes, for each axis, a demodulator 26 and filter 27 along with a servo preamplifier 12 and a servo final amplifier 15. [Col. 3, lines 54-63] ("*a control system connected to the means for moving for stabilizing the platform in response to information provided by the first sensor package and the second sensor package*," as in claim 1 of the '662 patent).

As discussed above, and as shown in the claims charts attached as Exhibit 14 to MSJ, Tijsma anticipates claims 1, 3, 4, 14, 31, 32, and 35 of the '662 patent under 35 U.S.C. 102, because Tijsma teaches every element recited in the claims.

### D.   *Bos*

Bos [Exhibit 11 to MSJ] describes a stabilization system with a gyro housing 11, which contains a vertical gyro 10, mounted on a platform 1 to be stabilized about two perpendicular axes (defined by shafts 4, 5) by means of at least two concentric cardan frames 2, 3 and a gyro-controlled servo system. [Col. 1, lines 5-11]. The cardan frames include an outer gimbal frame 3 and an inner gimbal frame 2. [Col. 1, lines 63-67]. The outer gimbal frame 3 is fixed to the ship's structure and thus is of fixed position relative to the ship ("*a base*," as in claim 1 of the '662 patent). [Col. 2, lines 1-2]. The inner gimbal frame 2 pivots about shaft 5 relative to the outer frame 3. [Col. 1, line 68 - Col. 2, line 3]. The platform 1 pivots about

**EX PARTE APPLICATION TO STAY**

shaft 4 relative to the inner gimbal frame 2. [Col. 2, lines 36-39]. The two gimbal axes 4 and 5 are mutually perpendicular. [Col. 1, line 9]. Means of motion include two servo motors 6, 7 and associated gear transmission systems 8, 9, respectively (i.e., "***a stabilizing system connected between the payload platform and the base, the stabilizing system including means for moving the payload platform with respect to the base about two different axes for providing the payload platform with stabilization in two dimensions***," as in claim 1 of the '662 patent). [Col. 2, lines 4-9, 34-39]. The control system includes servo amplifiers 14 and 15 [Col. 2, lines 32-36] and control circuits 24 and 25 [Col. 2, lines 52-68]. Platform-mounted sensors include two accelerometers 21, 22 [Col. 2, lines 58-60] and a two-shaft vertical gyro unit 11 that houses a vertical gyro 10, synchro transmitters 12, 13 and torque motors 16, 17 [Col. 2, lines 10-13, 26-30, 45-52] (i.e., "***a second sensor package comprising sensor means for sensing a position of the payload platform and for providing information based on the position of the payload platform relative to a predetermined position***" and "***wherein the second sensor package is fixed to the payload platform***, " as in claim 1 of the '662 patent).  Frame mounted sensors include synchro receivers 43 and 44 [Col. 3, lines 10-12]. Synchro receiver 43 monitors the angle of the inner frame 2, about shaft 5, in relation to the outer frame 3 and the ship. [Col. 3, lines 12-18]. Synchro receiver 43 monitors the angle of the platform 1, about shaft 4, in relation to the inner frame 2. [Col. 3, lines 12-18]. Shipmounted sensors include an external gyro stabilization system 26, which is a ship's gyro situated in the metacentre of the ship. [Col. 3, lines 3-5]. Two synchro transmitters 41 and 42 are at the output of the ship's gyro stabilization system 26. [Col. 3, lines 5-12]. The ship-mounted external gyro stabilization system 26 senses the position (pitch and roll) of the ship relative to horizontal, and thereby senses the position (relative to the horizontal) of outer-most gimbal frame 3, which is fixed to the ship's structure  (i.e., "***a first sensor package for***

**EX PARTE APPLICATION TO STAY**

*determining, in two transverse directions, motion of a moving object on which the stabilized platform is mounted*" **and** "*the first sensor package is fixed with respect to the base*," as in claim 1 of the '662 patent).  As the outer gimbal frame 3 (base) is fixed to the ship's structure and thus is of fixed position relative to the ship, the ship-mounted external gyro stabilization system 26 fixed with respect to the outer gimbal frame 3.

As discussed above and shown in the claim charts attached as Exhibit 15 to MSJ, Bos anticipates claims 1, 3, 4, 14, 31, 32 and 35 of the '662 patent under 35 U.S.C. 102, because Bos teaches every element recited in the claims.

### E.    *Vaassen*

Vassen [Exhibit 12 to MSJ] describes a stabilization device 1 with a servo control unit 2. [P. 4, lines 11-13].  The stabilization device 1 includes a yoke-shaped substructure 3 ("*a base*," as in claim 1 of the '662 patent), connected (i.e., fixed) to a ship, and a first movable yoke-shaped element 4 to which is coupled a second movable yoke-shaped element 5. [P. 4, lines 14-18]. The first movable yoke-shaped element 4 and second movable yoke-shaped element 5 are rotatable about mutually non-parallel shafts 6 and 7, respectively. [P. 4, lines 18-19]. A stabilization (payload) platform 8 is connected (fixed) to the second movable yoke-shaped element 5. [P. 4, lines 19-22].

A ship's pitch motions are compensated for by rotation of element 4 about shaft 6. [P. 4, lines 23-24]. The ship's roll motions are compensated for by rotation of element 5 about shaft 7. [P. 4, lines 24-26]. Both shafts 6 and 7 are provided with a servo motor and an angle sensor. [P. 4, lines 26-27]. The servo motors are controlled by servo control unit 2 which is connected to the angular encoders and to a centrally situated system of gyroscopes 12 for encoding the ship's roll, pitch and yaw angles with respect to a north-horizontal coordinate system (i.e., "*a first sensor package for determining, in two transverse directions, motion of a moving*

**EX PARTE APPLICATION TO STAY**

*object on which the stabilized platform is mounted*," as in claim 1 of the '662 patent). [P. 4, lines 30-35] (i.e., "*a stabilizing system connected between the payload platform and the base, the stabilizing system including means for moving the payload platform with respect to the base about two different axes for providing the payload platform with stabilization in two dimensions*," as in claim 1 of the '662 patent).  As the yoke-shaped substructure 3 is fixed to the ship, and the centrally situated system of gyroscopes 12 is fixed to the ship, the centrally situated system of gyroscopes 12 is fixed in relation to the yoke-shaped substructure 3.

The ship's roll, pitch and yaw angles as sensed by the centrally situated system of gyroscopes 12 are equal to the roll, pitch and yaw angles of the yoke-shaped substructure 3, excepting any deformations of the ship and the stabilization device. [P. 5, lines 4-6]. To compensate for such deformations, the stabilization platform 8 is provided with encoders 16 and 17. [P. 5, lines 6-8]. These encoders respectively measure an absolute pitch and roll angle velocity of the stabilization platform 8 with respect to an inertial coordinate system and are likewise connected to servo control unit 2 (i.e., "*a second sensor package comprising sensor means for sensing a position of the payload platform and for providing information based on the position of the payload platform relative to a predetermined position*," as in claim 1 of the '662 patent). [P. 5, lines 8-11]. By way of example, angular velocity encoders 16, 17 comprise gyrochips or rate gyro systems. [P. 5, lines 11-15]. The servo control unit 2 (i.e., "a control system connected to the means for moving for stabilizing the platform in response to information provided by the first sensor package and the second sensor package," as in claim 1 of the '662 patent) combines signals sent from the platform encoders 16, 17 with signals received from the centrally situated system of gyroscopes 12 and develops drive

**EX PARTE APPLICATION TO STAY**

signals to the pitch and roll motors to cause tilting motions about shafts 6 and 7 that achieve horizontal stabilization the platform 8. [P. 6, line 30 – P. 7, line 5]. As discussed above and shown in the claim charts attached as Exhibit 16 to MSJ, Vaassen anticipates claims 1, 3, 4, 14, 31, 32 and 35 of the '662 patent under 35 U.S.C. 102, because Vaassen teaches every element recited in the claims.

### F.   Significance of The New Prior Art

The prior art teaches every element of every asserted claim.  A stay or leave to file the attached motion for summary judgment will be productive, as the asserted claims will clearly and convincingly be found invalid for anticipation.

The asserted claims recite an "invention" that simply was not new. Providing sensor packages on both the payload platform and the base or the ship, was known, as shown in the prior art.  Sampling the sensors on the base or ship more frequently than the sensors on the payload platform was also known, as shown in the prior art.

Each prior art reference is new, i.e., has not previously been considered by the USPTO or a court.  Each prior art reference was carefully selected to teach all elements of the asserted claims, especially the elements that the previously considered prior art failed to teach.  In granting the Reexamination request on September 10, 2019, the USPTO agreed that the prior art raises a substantial new question of patentability for each asserted claim.  Plaintiffs have failed to identify any recited element of any asserted claim that is not taught by the prior art.  In sum, the prior art will invalidate the asserted claims and render a trial unnecessary.

## V.   SUMMARY JUDGMENT

In the event this Honorable Court declines to stay the proceedings, Defendant Klein Sr. hereby moves this Honorable Court to grant leave to file a Motion for Summary Judgment that every asserted claim of the '662 patent is invalid under 35 U.S.C. §102.

**EX PARTE APPLICATION TO STAY**

As set forth in detail, in Defendant's proposed Motion for Summary Judgment and Memorandum in Support Thereof which is attached as Exhibit 1 to this Memorandum, the new prior art cited and relied upon by Defendant conclusively establishes that the asserted claims of the '662 patent are invalid.  As summarized above, the prior art clearly teaches stabilization systems that include sensor packages on the payload platform, as well as sensor packages on the base and on the vehicle to which the base is attached.  The prior art teaches motors for moving gimbal frames about orthogonal axes.  The prior art teaches control systems that control motor actions based on sensor package output.  The prior art teaches all elements of each asserted claim, especially those elements that were not taught in the prior art relied upon in original examination and the prior reexamination.  Defendant demonstrates in its memorandum in support of its motion for summary judgment that every element of every asserted claim of the '662 patent is disclosed in the prior art.

Because the prior art clearly renders all claims of the Patents-in-Suit invalid, and a motion for summary judgment at this stage would avoid a trial, saving the Court, jurors and parties considerable time and resources, Defendant's motion for leave to file motion for summary judgment at this time, should be granted.

## VI.    CONCLUSION

There can be no question that the requested stay pending the reexamination sought by Klein Sr. may avoid a trial and, in any event, will simplify and focus the issues in this case, and avoid the risk of an inconsistent adjudication or issuance of an advisory opinion.  Additionally, because the accused MakoHeads are not in use and will remain so during the pendency of this case, a stay would not prejudice Plaintiffs.  Accordingly, a stay pending the outcome of the reexamination proceeding is warranted here.

**EX PARTE APPLICATION TO STAY**

In the event the Court declines to stay the proceedings pending the Reexamination, leave to file a Motion for Summary Judgment that the asserted claims of the '662 patent are invalid under 35 U.S.C. §102 will lead to a swift and efficient termination of this case and will avoid unnecessary waste of the Court's, the parties' and jurors' time and resources.

Dated:  September 26, 2019       Respectfully submitted,

MARK YOUNG, P.A.

By:   _s/Mark J. Young_
      MARK J. YOUNG

      Attorney for Defendants Oceanic
      Production Equipment, Ltd. and Jordan
      Klein Sr.


COASTAL LAW GROUP LLP

By:   _s/David A. Peck_
      David A. Peck
      Attorneys for Defendants Oceanic
      Production Equipment, Ltd. and Jordan
      Klein Sr.

**EX PARTE APPLICATION TO STAY**